Nicholas A. Coulson, Esq. (SBN 358903)
nick@coulsonpc.com
Ellyn Gendler (SBN 305604)
Egendler@coulsonpc.com
**COULSON P.C.**
300 River Place Drive
Suite 1700
Detroit, Michigan 48207
T: (313) 644-2685

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| STEPHANIE WOHLFIEL and VIANCA MARQUEZ, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>ADOBE INC.,<br><br>*Defendant*. | Case No. 5:25-cv-06562-NC<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Assigned to: Hon. Nathanael M. Cousins<br><br>Date: Dec. 2, 2026<br><br>Time: 11:00 a.m.<br><br>Place: Courtroom 5, 4th Floor |

# Table of Contents


INTRODUCTION ... 1
BACKGROUND ... 2
I. ADOBE'S DECEPTIVE "ANNUAL, BILLED MONTHLY" SUBSCRIPTION SCHEME. 2
A. Adobe Funnels Consumers into the ABM Plan, Its Most Lucrative Product. ... 2
B. Adobe's Enrollment Process Conceals the ABM Plan's Material Terms. ... 3
C. The ETF Trap Springs When Consumers Try to Cancel. ... 5
D. The Federal Government Pursued Adobe for the Same Practices, and Adobe Agreed to a Permanent Injunction. ... 6
E. Plaintiffs Were Deceived into ABM Subscriptions They Never Would Have Purchased. . 6
F. This Court Granted Plaintiffs' Motion for Reconsideration and Ruled on Adobe's Initial Motion to Dismiss. ... 7
LEGAL STANDARDS ... 8
I. RULE 12(b)(1) ... 9
II. RULE 12(b)(6) ... 9
III. RULE 12(f) ... 9
ARGUMENT ... 10
I. ADOBE'S RENEWAL OF ITS ARGUMENT THAT ITS ABM PLAN IS NOT DECEPTIVE IS AN IMPROPER MOTION FOR RECONSIDERATION, AND OTHERWISE WITHOUT MERIT. ... 10
A. Adobe Cannot Revive an Argument the Court Previously Rejected. ... 10
B. In Any Case, Plaintiffs Plausibly Plead that the ABM Plan is Deceptive. ... 11
II. PLAINTIFF MARQUEZ DOES NOT SEEK TO RECOVER FOR ARL-PREDICATED UCL CLAIMS. ... 13
III. AN ANNUAL RENEWAL IS UNNECESSARY FOR STANDING TO CHALLENGE ADOBE'S AUTO-RENEWAL NONDISCLOSURES ... 14
IV. PLAINTIFFS PLAUSIBLY ALLEGE ENTITLEMENT TO EQUITABLE RELIEF ... 16
V. PLAINTIFFS DO NOT RAISE STAND-ALONE "SIMPLE CANCELLATION" CLAIMS. 17
VI. THERE IS NO BASIS TO STRIKE CLASS AND SUBCLASS ALLEGATIONS. ... 18
A. Adobe Misconstrues Plaintiffs' Claims. Rule 23, not Article III standing, Applies to Purported Dissimilarities Between Class Representatives and Unnamed Class Members. ... 18
B. Plaintiff Marquez and Putative Class Members Who Did Not Cancel Were Injured by Adobe's Misconduct. ... 20
C. This District Consistently Addresses Choice-of-Law at Class Certification and Adobe's Deficient Choice-of-Law Argument Does Not Warrant Changing that Approach. ... 22
VII. IF THE COURT GRANTS THE MOTION IN ANY RESPECT, IT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND. ... 25
CONCLUSION ... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold v. Hearst Magazine Media, Inc.*, No. 19-cv-1969-WQH-MDD, 2021 U.S. Dist. LEXIS 25706 (S.D. Cal. Feb. 10, 2021) ........ 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 9

*Crowder v. Shade Store, LLC*, No. 23-cv-02331-NC, 2025 U.S. Dist. LEXIS 43189 (N.D. Cal. Mar. 10, 2025) ........ 16

*Dalton v. Anovos Prods., LLC*, No. CV 19-4821-MWF-KS, 2019 U.S. Dist. LEXIS 228855 (C.D. Cal. Sept. 27, 2019) ........ 24

*Foret v. Adobe Inc.*, No. 25-cv-09221-PCP, 2026 U.S. Dist. LEXIS 207506 (N.D. Cal. Sept. 14, 2026) ........ 1, 11, 12, 13

*French v. Banana Republic LLC*, No. 24-cv-05216-VC, 2024 U.S. Dist. LEXIS 200279 (N.D. Cal. Nov. 4, 2024) ........ 16

*Frenzel v. AliphCom*, 76 F. Supp. 3d 999 (N.D. Cal. 2014) ........ 24

*Guthrie v. Transam. Life Ins. Co.*, 561 F. Supp. 3d 869 (N.D. Cal. 2021) ........ 16

*Hill v. Pac. Mar. Ass'n*, No. 24-cv-00336-JSC, 2025 U.S. Dist. LEXIS 84530 (N.D. Cal. May 2, 2025) ........ 9, 20

*Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013) ........ 14, 20, 21

*In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888 (N.D. Cal. 2018) ........ 21

*Jackson v. Carey*, 353 F.3d 750 (9th Cir. 2003) ........ 25

*Johnson v. Trumpet Behavioral Health, LLC*, No. 3:21-cv-03221-WHO, 2022 U.S. Dist. LEXIS 3706 (N.D. Cal. Jan. 7, 2022) ........ 16

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) ........ 20, 21

*Leventhal v. Streamlabs LLC*, No. 22-cv-01330-LB, 2022 U.S. Dist. LEXIS 231211 (N.D. Cal. Dec. 23, 2022) ........ 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........ 9

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) ........ 9, 14

*Mayron v. Google LLC*, 54 Cal. App. 5th 566 (2020) ........ 15

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ........ 15, 22, 23, 24

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68 (2010) ........ 23

*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) ........ 9

*Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) ........ 19, 20

*Noll v. eBay, Inc.*, No. 5:11-CV-04585-EJD, 2013 U.S. Dist. LEXIS 76323 (N.D. Cal. May 30, 2013) ........ 14

*Nunez v. Saks Inc.*, 771 F. App'x 401 (9th Cir. 2019) ........ 20

*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190 (N.D. Cal. 2014) ........ 22

*Phillips v. Brooklyn Bedding LLC*, No. 23-cv-03781-RFL, 2024 U.S. Dist. LEXIS 72676 (N.D. Cal. Mar. 28, 2024) ........ 16

*Prescott v. Bayer HealthCare LLC*, No. 20-cv-00102-NC, 2020 U.S. Dist. LEXIS 136651 (N.D. Cal. July 31, 2020) ........ 22

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867 (9th Cir. 2000) ........ 18

*Rice-Sherman v. Big Heart Pet Brands, Inc.*, No. 19-cv-03613-WHO, 2020 U.S. Dist. LEXIS 46197 (N.D. Cal. Mar. 16, 2020) ........ 21

*Singh v. Adobe Inc.*, No. 3:24-cv-03980-JSC, ECF No. 34 (N.D. Cal. Feb. 13, 2025) ........ 15

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ........ 16

*T.K. v. Adobe Sys. Inc.*, No. 17-CV-04595-LHK, 2018 U.S. Dist. LEXIS 65557 (N.D. Cal. Apr. 17, 2018) ........ 21, 23

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ........ 9

*United States v. Adobe Inc.*, 791 F. Supp. 3d 966 (N.D. Cal. 2025) ........ *passim*

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008) ........ 11

*Zinn v. Ex-Cell-O Corp.*, 148 Cal. App. 2d 56 (1957) ........ 23

**Statutes**

15 U.S.C. § 8401 *et seq.* (Restore Online Shoppers' Confidence Act) ........ 6, 10, 12

Cal. Bus. & Prof. Code § 17200 *et seq.* (Unfair Competition Law) ........ *passim*

Cal. Bus. & Prof. Code § 17500 *et seq.* (False Advertising Law) ........ *passim*

Cal. Bus. & Prof. Code § 17600 *et seq.* (Automatic Renewal Law) ........................................ 2, 13, 14

Cal. Civ. Code § 1750 *et seq.* (Consumers Legal Remedies Act) ............................................ *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 8, 9, 18

Fed. R. Civ. P. 12(b)(6)........................................................................................................ 8, 9, 18

Fed. R. Civ. P. 12(f)............................................................................................................. 8, 9, 18

Fed. R. Civ. P. 12(g)(2)........................................................................................................... 1, 18

Fed. R. Civ. P. 15 ....................................................................................................................... 25

Fed. R. Civ. P. 23 ........................................................................................................... 18, 19, 21

Civil L.R. 7-3(a)............................................................................................................................ 3

Civil L.R. 7-9 .............................................................................................................................. 10

## INTRODUCTION

In seeking dismissal of Plaintiffs' Second Amended Complaint (ECF No. 65) ("SAC"), Adobe proceeds as though unconstrained by either the operative allegations or the Court's prior Order.

The SAC alleges how Adobe deceptively sells its "Annual, Billed Monthly" ("ABM") plan—it advertises only a monthly price, promises consumers they can "Cancel anytime," and hides the year-long commitment and a 50% early termination penalty behind a tooltip and a hyperlinked pop-up. Adobe has already agreed to a $75 million civil penalty and a permanent injunction barring it from confining material terms to just such hyperlinks and tooltips. Instead of contending with the SAC's allegations, Adobe's Motion to Dismiss (ECF No. 66) ("Motion" or "MTD") concocts an alternate universe of facts characterized by "customer-friendly subscription practices," "clear disclosures," and a "flexible subscription model that caters to a variety of customer preferences." MTD at 8–9. Citing nothing, it asserts that customers can cancel "in around a minute," that its customer base grew "because of—not in spite of" its subscription practices, and that ABM customers "retain the discounted monthly price" after the first year—refuted by its own checkout page, which warns that the "[p]rice [is] subject to change at renewal." *None of this* appears in the SAC or is otherwise properly before the Court.

Adobe takes similar liberties with the record. It claims the Court's September 2, 2026 Order (ECF No. 62) ("September 2026 Order") "did not reach the merits" of its argument that the ABM plan's annual term is not misleading as a matter of law, when the Court in fact held that, at this stage, *United States v. Adobe* does not foreclose Plaintiffs' claims—and then re-argues the point in what amounts to an unauthorized motion for reconsideration. It also raises class-definition and nationwide-class challenges that were available to it but omitted from its first motion, and are thus waived under Rule 12(g)(2).

Stripped of these distortions, Adobe's arguments fail. Plaintiffs plausibly allege that the enrollment flow, as a whole, misleads reasonable consumers, as the court in *Foret v. Adobe Inc.*, No. 25-cv-09221-PCP, 2026 U.S. Dist. LEXIS 207506, at *19 (N.D. Cal. Sept. 14, 2026) recently held on similar allegations. They allege injury traceable to Adobe's automatic-renewal violations, and they

cure the equitable-relief deficiency the Court identified. They assert no stand-alone "simple cancellation" claim, and Adobe's cursory choice-of-law analysis cannot justify the extraordinary measure of striking class allegations from the SAC. The Motion's only meritorious point—that a Nebraska resident cannot predicate an Unfair Competition Law ("UCL") claim on California's Automatic Renewal Law ("ARL")—is one Plaintiffs do not contest. The Motion should be denied.

## BACKGROUND

Plaintiffs Stephanie Wohlfiel and Vianca Marquez brought this action to challenge Adobe's widespread deceptive product licensing practices that were designed to confuse consumers and extract inflated revenue to the detriment of consumers. *See generally* SAC.

### I. ADOBE'S DECEPTIVE "ANNUAL, BILLED MONTHLY" SUBSCRIPTION SCHEME.

#### A. Adobe Funnels Consumers into the ABM Plan, Its Most Lucrative Product.

In 2012, Adobe became one of the first major software companies to abandon traditional licensing in favor of an auto-renewing subscription model—a shift that helped propel Adobe to record revenue of $21.51 billion in 2024. ¶¶ 13–14, 24–26. Adobe offers up to three subscription plans: Monthly ("MO"), a true month-to-month plan with no term commitment; Annual, prepaid ("AP"), an annual commitment paid up front; and Annual, billed monthly ("ABM"), an annual commitment paid in monthly installments. ¶¶ 27, 29. Not every product offers every plan, and for certain products the ABM plan is the only plan offered. ¶¶ 28, 47. Even where alternatives exist, Adobe frequently pre-selects the ABM plan as the default—even when it is not listed first. ¶ 46.

According to the FTC, ABM subscriptions account for "most of Adobe's subscription revenues." ¶ 91. And the engine of that revenue is the early termination fee ("ETF") embedded in the plan—a fee one Adobe executive described as "a bit like heroin for Adobe," adding that "there is absolutely no way to kill off ETF or talk about it more obviously [without] taking a big business hit[.]" ¶ 3.

The ABM plan's actual terms are far more onerous than its monthly price tag suggests. An ABM subscriber is bound to a year-long contract and charged automatically every month; if she

cancels after the first 14 days, she must pay an ETF equal to 50% of all remaining payments for the year—and Adobe then terminates her service at the end of that month's billing period. ¶ 41. Adobe thus collects half the remaining contract value while delivering nothing in return. ¶ 76. The result is a plan that "lock[s] unwitting consumers into year-long contracts that strongly deter consumers from cancelling." ¶ 42; *see also* ¶¶ 75–76.

Adobe's Motion attempts to controvert these allegations with unsupported assertions of broad consumer choice that ignore its misleading enrollment flow and substantial termination penalties. MTD at 9-10. None of this appears in (or can be reconciled with) the SAC, and none of it may be credited on a motion to dismiss. Pursuant to Civil L.R. 7-3(a), Plaintiffs object to these and the other extra-pleading assertions noted above, and ask that the Court disregard them. The SAC alleges the opposite: that Adobe "purposefully designed its cancellation process to be confusing and frustrating to consumers," that consumers often "must make repeated efforts through multiple channels to cancel," that Adobe peppers them with retention offers mid-cancellation, and that some consumers who successfully cancelled continued to be charged. ¶¶ 78–83. Those allegations are corroborated by numerous public consumer complaints, ¶¶ 85–86, and by the federal government's own allegations against Adobe. ¶ 88.

**B. Adobe's Enrollment Process Conceals the ABM Plan's Material Terms.**

Every consumer who buys an ABM subscription online must complete Adobe's enrollment process—including a subscription selection page and a final checkout page—which is "the primary means by which Adobe communicates the price and terms of its plans to consumers before purchase." ¶ 72. That process "fails to clearly and conspicuously disclose and intentionally obscures" the ABM plan's material terms: that it is a one-year commitment rather than a monthly plan, that an ETF exists, how the ETF relates to the one-year contract, and how much it costs. ¶ 39. The "combined effect" is that consumers "agree to what they believe is only a monthly commitment" but are in fact "obligated to pay for a full year of the service or face a substantial penalty payment for cancelling." ¶ 40.

1. **The Subscription Selection Page**.

The first page a consumer sees displays the available plans side by side, each with its price in

large, bold type. ¶¶ 44–45 & Ex. B. For the ABM plan, that price is a monthly figure only; the total annual cost appears nowhere. ¶¶ 46, 48. Beneath the price, in faint gray text, Adobe states only that a "Fee applies if you cancel after [DATE]." ¶¶ 49–50. Anything more is hidden behind a small ⓘ icon that the consumer must click or hover over—and if she does not, she sees nothing more. ¶ 51. Even the hidden text omits the ETF's amount, stating only that "[i]f you cancel after 14 days, your service will continue until the end of that month's billing period, and you will be charged an early termination fee"—phrasing that suggests a simple end-of-month cutoff, not a penalty tied to the entire remaining contract. ¶¶ 52–55 & Ex. C. Nowhere on the page does Adobe disclose the amount of the ETF, how it is calculated, its relationship to the subscription's total price, or that the plan entails "a year-long commitment upon pain of a substantial termination fee." ¶¶ 54, 56.

2. **The Checkout Page**.

At the final checkout page, where the consumer enters her payment information, Adobe again "heavily emphasizes the 'monthly' aspect of the ABM subscription," repeatedly displaying only the monthly installment price; the total annual cost appears nowhere on the page. ¶¶ 59–61 & Ex. D. The label "Annual, billed monthly" sits beside a monthly price, and the only reference to the plan's term is a passing mention of "the end of your one-year term" in a small-print paragraph beneath the payment options. ¶ 62. Because the plan converts to month-to-month after the first year, the fine print reinforces the impression that the plan was always a flexible monthly arrangement. ¶ 63. The same paragraph tells consumers only to "Cancel before [DATE] to get a full refund and avoid a fee"—without identifying it as an early termination fee, stating its amount, or explaining its relationship to the contract's total cost—and then immediately reassures them that they may "Cancel anytime via Adobe Account or Customer Support." ¶¶ 64–65. Adobe itself has represented to this Court that the relevant portions of its checkout page at the time of Plaintiffs' 2023 purchases were "substantially identical" to the page depicted in the SAC. ¶ 72 (citing ECF No. 7 at 3–4; ECF No. 8 ¶ 12).

3. **Hyperlinked Pop-Up Window**.

The ETF's amount is disclosed exactly once in the entire enrollment process—and only to a consumer who goes looking for it. She must click a "Subscription and Cancellation Terms" hyperlink

"cluttered among other links at the very end" of the fine-print paragraph, open a pop-up window, and scroll "all the way to the bottom." ¶¶ 66–67 & Ex. E. There, for "the first and only" time, Adobe discloses that a consumer who cancels after 14 days will be "charged a lump sum amount of 50% of your remaining contract obligation." ¶¶ 67–68, 70. Even then, Adobe abandons the word "fee" used everywhere else in the enrollment process in favor of "lump sum," making it harder for consumers to connect the two, and never explains what "remaining contract obligation" means or references the year-long term. ¶¶ 69, 71.

Adobe's Motion does not grapple with any of this. It describes the enrollment process as presenting "the names of the available subscription options and their monthly prices," MTD at 10—conceding that only monthly prices are shown—and then asserts that Adobe "clearly and conspicuously discloses" the ABM plan's terms, "including providing numerous disclosures about the Early Termination Fee." MTD at 8. But the Motion never mentions the checkout page, its "No annual commitment" and "Cancel anytime" language, or the hyperlinked pop-up in which the ETF's amount is first and only disclosed. The SAC alleges that the ETF's amount and its tie to the remaining contract value appear only once, behind a link. ¶¶ 54, 64, 67, 70. And whatever disclosures Adobe makes "after checkout," MTD at 8, by definition come too late to inform a consumer's purchasing decision.

**C. The ETF Trap Springs When Consumers Try to Cancel.**

Because Adobe buries the ABM plan's true terms, consumers "often learn about the early termination fee for the first time when they investigate or start the cancellation process." ¶ 74. Confronted with a substantial penalty—coupled with the immediate loss of the service they are paying for—many abandon cancellation and continue paying for a subscription they no longer want, while others pay the ETF. ¶¶ 75–76. Either way, Adobe profits from "a misleading subscription process that locks unwitting consumers into a year-long commitment, cancellation terms that incentivize subscribers to pay the full annual cost, and an auto-renewal set-up that capitalizes on the likelihood of consumers not taking affirmative action to cancel." ¶ 87. Despite a long history of consumer complaints, Adobe has not changed its enrollment process to address any of these issues. ¶¶ 85–86,

90.

**D. The Federal Government Pursued Adobe for the Same Practices, and Adobe Agreed to a Permanent Injunction.**

Plaintiffs are not alone in these allegations. The FTC sued Adobe under the Restore Online Shoppers' Confidence Act ("ROSCA") for "similar practices," alleging that Adobe failed to clearly and conspicuously disclose the ABM plan's material terms, failed to obtain consumers' express informed consent, and failed to provide a simple cancellation process. ¶ 88. The FTC alleged that Adobe intentionally structured the ABM enrollment process to obscure the year-long commitment and the existence and substantial amount of the ETF, and that Adobe knew of widespread consumer confusion and complaints but refused to change its practices because they were so lucrative. ¶¶ 89–90.

On March 13, 2026, Adobe stipulated to the entry of a judgment "in connection with its marketing and sale of subscriptions," agreeing to pay $75 million in civil penalties and to provide $75 million in free services to customers. ¶¶ 92–93. Those free services are expressly "not compensation for actual pecuniary loss" and do not resolve the consumer claims in this action. ¶ 94. The stipulated order, entered on April 10, 2026, permanently enjoins Adobe from failing to clearly and conspicuously disclose all material terms of its negative-option subscriptions before obtaining consumers' billing information; prohibits Adobe from making those disclosures "only in a way that requires navigating to a separate window or page, such as by clicking a hyperlink, link, tooltip, or other similar mechanism"; and requires Adobe to provide simple cancellation mechanisms. ¶¶ 95–96. A tooltip and a hyperlink are precisely the mechanisms to which Adobe relegated the ABM plan's critical terms when Plaintiffs enrolled. ¶¶ 51–53, 66–68.

**E. Plaintiffs Were Deceived into ABM Subscriptions They Never Would Have Purchased.**

**1. Plaintiff Stephanie Wohlfiel**

Between July and September 2023, Plaintiff Wohlfiel purchased approximately ten ABM subscriptions for Adobe Lightroom for a photography job scheduled for November 2023. ¶¶ 99–100.

Because she expected to need the software only through that job, she intended to purchase month-to-month subscriptions she could cancel when the job ended. ¶ 100. Before each purchase, she reviewed the subscription selection page, ¶¶ 101-02. Nothing she saw disclosed a twelve-month commitment or a fee equal to 50% of the remaining contract balance. ¶¶ 101–02. Based on what Adobe displayed—and did not display—she understood that she was purchasing month-to-month subscriptions that she could cancel at any time without a substantial charge. ¶ 104. Had Adobe clearly disclosed the one-year commitment and the ETF in the enrollment process, she would have seen it. ¶ 105.

When the photography job ended in late November 2023, Ms. Wohlfiel began the cancellation process—and only then learned that each subscription bound her to a twelve-month contract and that Adobe would charge her an ETF equal to 50% of the remaining obligation on each. ¶¶ 106–08. Having no further need for the software, she progressively cancelled the subscriptions between November 2023 and January 2024, paying an ETF for each subscription she cancelled. ¶¶ 109–10.

**2. Plaintiff Vianca Marquez**

In mid-June 2023, Plaintiff Marquez purchased an ABM subscription to Adobe Acrobat for personal, family, or household purposes—primarily or exclusively to view and edit personal documents. ¶¶ 111–12. She encountered the same pages Ms. Wohlfiel did. ¶¶ 113–14. She understood she was buying a month-to-month subscription that she could cancel at any time without a substantial charge, and she would not have purchased it had the true terms been disclosed. ¶¶ 116–17. Approximately one month later, in mid-July 2023, she initiated cancellation and learned for the first time that the subscription was annual and that Adobe would charge her an ETF of roughly $250—50% of the approximately eleven months remaining on the contract. ¶¶ 118–20. Faced with that penalty, she abandoned the cancellation process and has remained in the ABM subscription ever since. ¶¶ 121–22.

**F. This Court Granted Plaintiffs' Motion for Reconsideration and Ruled on Adobe's Initial Motion to Dismiss.**

Adobe previously filed a Motion to Dismiss and Motion to Strike the original complaint on October 7, 2025. ECF No. 7 ("First MTD"). On March 31, 2026, the Court initially granted Adobe's

First MTD with leave to amend. ECF No. 48 ("March 2026 Order").[1]

Upon leave of Court, Plaintiffs filed a Motion for Partial Reconsideration of the Court's March 2026 Order, requesting reconsideration of the Court's collateral rulings on Adobe's waiver of its right to arbitrate and that the Dispute Resolution Provision's "opt-out" provision precludes a finding of procedural unconscionability. ECF No. 50-1 ("Motion for Reconsideration").

The Court granted Plaintiffs' Motion for Reconsideration on September 2, 2026 and reassessed its March 2026 Order. ECF No. 62. After reconsideration, the Court found that Adobe waived its right to compel arbitration as a whole and that the opt-out clause did not bar a finding of procedural unconscionability. *See* September 2026 Order at 29. Reassessing Adobe's First MTD, the Court found that: (1) Adobe's one-year limitation and conditions precedent arguments are moot in light of its new unconscionability findings; (2) Plaintiffs insufficiently alleged actual reliance to support their UCL, False Advertising Law ("FAL"), and Consumers Legal Remedies Act ("CLRA") claims; (3) *United States v. Adobe Inc.*, 791 F. Supp. 3d 966 (N.D. Cal. 2025) is not binding, was analyzed under a different cause of action, and, at this stage, does not foreclose Plaintiffs' argument that the ABM plan was deceptive; and (4) Plaintiffs insufficiently alleged entitlement to injunctive and other equitable relief. Based on its findings, the Court granted Adobe's First MTD in part and denied in part with leave to amend. In accordance with the Court's deadline, Plaintiffs filed the Second Amended Complaint on September 28, 2026.[2] ECF No. 65.

## LEGAL STANDARDS

Adobe moves to dismiss the SAC based on lack of standing under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Adobe also requests dismissal of class definitions and nationwide class allegations, which—although not framed as such by Adobe—are functionally requests to strike class allegations pursuant to Federal

[1] The Court also denied Adobe's Motion to Strike (ECF No. 7) and Plaintiffs' Motion for Corrective Action (ECF No. 21) as moot.

[2] Plaintiffs filed the First Amended Complaint (ECF No. 52) on April 21, 2026 under the Court's since-vacated March 2026 Order. Plaintiffs withdrew the First Amended Complaint in conjunction with the SAC. SAC, n. 1.

Rule of Civil Procedure 12(f).

**I. RULE 12(b)(1)**

Rule 12(b)(1) allows a defendant to move for dismissal for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). An argument that a plaintiff lacks Article III standing falls under Federal Rule of Civil Procedure 12(b)(1). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). A plaintiff establishes standing if they show that: "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

**II. RULE 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must be denied where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir. 2004) (internal citation omitted).

**III. RULE 12(f)**

Federal Rule of Civil Procedure 12(f) provides that a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are generally disfavored and should only be granted if the matter sought to be stricken clearly has no possible bearing on the subject matter of the litigation." *Hill v. Pac. Mar. Ass'n*, No. 24-cv-00336-JSC, 2025 U.S. Dist. LEXIS 84530, at *16 (N.D. Cal. May 2, 2025) (citation omitted). "[C]ourts in this District do not generally consider motions to strike class allegations at the pleading stage." *Hill*, 2025 U.S. Dist. LEXIS 84530, at *16 (citation omitted).

## ARGUMENT

### I. ADOBE'S RENEWAL OF ITS ARGUMENT THAT ITS ABM PLAN IS NOT DECEPTIVE IS AN IMPROPER MOTION FOR RECONSIDERATION, AND OTHERWISE WITHOUT MERIT.

Adobe renews its argument that the ABM plan's annual commitment is not misleading, again relying on *United States v. Adobe Inc.*, 791 F. Supp. 3d 966 (N.D. Cal. 2025) ("*U.S. v. Adobe*"). MTD at 14-18. This is an improper request for reconsideration of an argument the Court has already rejected. In any event, Plaintiffs plausibly allege that the ABM plan is deceptive as to the annual commitment.

#### A. Adobe Cannot Revive an Argument the Court Previously Rejected.

Adobe readily admits that it previously moved to dismiss on the same basis in its First MTD. MTD at 14-18. Its claim that the Court did not truly reach this argument rewrites the Court's September 2026 Order, where the Court explicitly addressed and rejected the argument. ECF No. 62 at 28. The Court found that *U.S. v. Adobe* was not binding and did not foreclose Plaintiffs' claims that the ABM plan's annual commitment was misleading. ECF No. 62 at 28. The Court also found that the argument failed because Adobe did not explain why an analysis under ROSCA would apply to the causes of action in this matter. ECF No. 62 at 28.

Adobe does not now get a second bite of the apple. Adobe clearly knew of and relied on the *U.S. v. Adobe* opinion in its First MTD and could have—but as the Court observed, clearly did not—present the "reasonable consumer" analysis. Instead, Adobe chose to ask the Court to conclude that the annual commitment was not misleading based solely on its theory that *U.S. v. Adobe* was dispositive as a matter of law. The Court's findings in its September 2026 Order are not, under any reasonable interpretation, an invitation or basis for Adobe to have a "do-over" after its first failure.

No new germane factual allegations were added to the SAC. By addressing the same set of allegations with the same rejected argument, Adobe effectively moves for reconsideration of the Court's prior decision, without leave of court in violation of Civil L.R. 7-9(a). Adobe had the opportunity to fully litigate the issue of whether the annual commitment of the ABM plan was

misleading, and could have sought leave to file a motion for reconsideration after the Court issued its September 2026 Order, but it failed to do so. Such a motion would have been meritless—there has been no intervening change in controlling authority, and no failure to consider appropriate facts or law. *See* Civil L.R. 7-9(b).

**B. In Any Case, Plaintiffs Plausibly Plead that the ABM Plan is Deceptive.**

Applying the analysis in *U.S. v. Adobe*, Adobe argues that the ABM plan is not misleading to a reasonable consumer. MTD at 14-18. Adobe argues this theory underlies each of Plaintiffs' claims and warrants their dismissal. *Id*. This argument misleadingly narrows the nature and scope of Plaintiffs' claims. Claims under the UCL, FAL, and CLRA are governed by the "reasonable consumer test," which "considers whether 'members of the public are likely to be deceived.'" *Foret v. Adobe Inc.*, No. 25-cv-09221-PCP, 2026 U.S. Dist. LEXIS 207506, at *19 (N.D. Cal. Sept. 14, 2026) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). "California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact[.]" *Id*. (quoting *Williams*, 552 F.3d at 938).

*Foret* is particularly apposite and instructive. The *Foret* court determined, considering the enrollment process as a whole, "despite its name, the 'Annual, billed monthly' plan, by listing its price on a monthly basis, could plausibly mislead consumers into thinking that they were signing up for a monthly plan, albeit of fixed duration, as opposed to an annual plan that spaces out payments by month. A reasonable consumer facing the multitude of options and series of pages to sign up for a subscription could plausibly have been misled as to what they were signing up for and the terms of their subscription." *Foret*, 2026 U.S. Dist. LEXIS 207506, at *20-21.

While Adobe attempts to summarily distinguish them, Plaintiffs' allegations regarding the deceptive nature of the enrollment flow—*as a whole*—are materially similar to those found sufficient in *Foret*. Here, Plaintiffs plausibly plead that a reasonable consumer would be deceived by Adobe's enrollment process as to the material terms of the ABM plan, including the one-year commitment, the existence of the ETF, the relationship of the ETF to the one-year term, and the amount of the ETF. The SAC alleges that the enrollment process shows only a monthly price in large, bolded type for the

ABM plan, and that the process does not identify the total annual cost. ¶¶ 45, 48. It also alleges that not all products offer all three subscription plans, and that for certain products, the ABM plan is the only plan offered. ¶¶ 28, 47. Even when there are multiple plan options, the ABM plan is frequently "pre-selected as the default selection in the enrollment process." ¶ 46. The ABM plan displays "faint, gray text" below the large, bold price that reads "Fee applies if you cancel after [DATE]." ¶¶ 49–50. To see any additional information, consumers must click or hover over an icon next to the faint text. ¶ 51. Clicking the icon displays a pop-up box that reads "If you cancel after 14 days, your service will continue until the end of that month's billing period, and you will be charged an early termination fee." ¶¶ 51–53. The subscription page does not contain any information "as to the amount of the early termination fee, how it is calculated, or its relationship to the total price of the subscription" and has "no clear statement…that the subscription entails a year-long commitment upon pain of a substantial termination fee." ¶¶ 54, 56.

The same type of misleading presentation is present in the checkout page, which Plaintiffs allege "heavily emphasizes the 'monthly' aspect of the ABM subscription," displaying only the monthly installment price, failing to display the total annual cost. ¶¶ 60-62. The checkout page allegedly has only a "passing mention" of a one-year term in "small-print." ¶ 62. The page also tells consumers that they can "Cancel anytime" which "convey[s] a level of ease and flexibility that is incongruous with the financial penalties associated with early cancellation." ¶ 65. Indeed, the first and only instance consumers "receive any specific information about cancellation and the ETF," including that the ETF is "explicitly linked to the total contract value," is in a pop-up window that consumers only see by clicking a "Subscription and Cancellation terms" hyperlink at the very end of the checkout page. ¶¶ 66-70. "The *combined effect* of [Adobe's] disclosure failure [of material terms, including the one-year commitment, the existence of the ETF, its relationship to the annual commitment, and the amount of the ETF] is that consumers are likely to agree to what they believe is only a monthly commitment" when in actuality they "become obligated to pay for a full year of the service or face a substantial penalty payment for cancelling." ¶ 40 (emphasis added).

In attempting to distinguish *Foret*, Adobe mischaracterizes the instant Plaintiffs' claims by

superficially isolating certain allegations at the expense of the overall enrollment flow. MTD at 18. But Plaintiffs' theory here is exactly the same as that at issue in *Foret*: that Adobe's misrepresentation and omissions in its enrollment process as a whole were deceptive and misleading as to the material terms of its ABM plan. ¶¶ 39-87.

In support of its argument, Adobe cites *U.S. v. Adobe*, which held that, under ROSCA, a reasonable consumer would not have been misled as to the annual term.[3] But, as this Court previously noted, *U.S. v. Adobe*'s conclusion is not dispositive nor does it require the conclusion that the annual commitment of the ABM plan is not misleading. *See* ECF No. 62 at 28. The *Foret* court reached that same conclusion. *Foret*, 2026 U.S. Dist. LEXIS 207506, at *21. Moreover, the *U.S. v. Adobe* court's annual-term conclusion rested in part on its finding that "all three plans appear together, allowing the consumer to compare each." *U.S. v. Adobe*, 791 F. Supp. 3d at 985. That specific fact is absent in this matter. Here, Plaintiffs allege a different context in which plan comparison was not always available to consumers as not all products offer all three subscription plans and that the ABM plan was the only plan offered for certain products. ¶¶ 28, 47.

Moreover, Adobe's deceptive and misleading presentation of the ETF, including its existence, calculation and amount, and relationship to the annual term, is also a core premise of Plaintiffs' claims. ¶¶ 39-86, 89-90, 103-104, 115-116, 156, 162-163. The *U.S. v. Adobe* court and the *Foret* court both concluded that a reasonable consumer would be misled as to the ETF and its methodology. *U.S. v. Adobe*, 791 F. Supp. 3d at 985–86 (concluding the complaint plausibly alleged that Adobe did not clearly and conspicuously disclose the ETF and the cancellation fee methodology); *Foret*, 2026 U.S. Dist. LEXIS 207506, at *22 (finding the information about the cancellation fee was "easy to miss" and concluding that a "reasonable consumer could fairly be misled as to what the fee is, when exactly it applies, and the amount it would be").

## II. PLAINTIFF MARQUEZ DOES NOT SEEK TO RECOVER FOR ARL-

---

[3] Adobe relies heavily on the district court's pleading-stage ruling as proof that its disclosures were adequate, yet never mentions that the same case ended with Adobe agreeing to a $75 million civil penalty, $75 million in free services, and a permanent injunction barring it from relying solely on the very disclosure devices at issue here.

**PREDICATED UCL CLAIMS.**

Adobe seeks dismissal of Plaintiff Marquez's ARL-predicated UCL claims, arguing that non-California consumers cannot bring claims based on ARL violations.[4] MTD at 18. Plaintiff Marquez agrees that the ARL applies only to California consumers and, as a Nebraska resident, does not seek to recover under the UCL for ARL violations. *See Noll v. eBay, Inc.*, No. 5:11-CV-04585-EJD, 2013 U.S. Dist. LEXIS 76323, at *19 (N.D. Cal. May 30, 2013).

However, while she cannot predicate a UCL claim based on a violation of the ARL, Plaintiff Marquez can allege facts about Adobe's failure to clearly disclose automatic renewal terms (without citing the ARL as a predicate statute) to support her unfair and fraudulent UCL claims, as well as her misrepresentation, omissions, and false-advertising claims that Adobe's enrollment and disclosure practices are deceptive and misleading to consumers. *See Leventhal v. Streamlabs LLC*, No. 22-cv-01330-LB, 2022 U.S. Dist. LEXIS 231211, at *16-17 (N.D. Cal. Dec. 23, 2022). Moreover, Plaintiff Marquez also plausibly pleads other violations that are independently actionable under the UCL, including legal violations of the CLRA and FAL and claims under the unfair and fraudulent prongs. ¶¶ 152-54, 157-170. Accordingly, there is no basis to dismiss Plaintiff Marquez's UCL claims.

Because Plaintiff Marquez does not seek to recover for an ARL-predicated UCL claim and plausibly pleads other bases for her UCL claims, the Court should deny as moot this part of the motion. Any dismissal should be limited to Plaintiff Marquez's individual ARL-predicated theory and should be without prejudice to the ARL claims of California members of the Consumer Subclass or to amendment adding a California representative.

## III. AN ANNUAL RENEWAL IS UNNECESSARY FOR STANDING TO CHALLENGE ADOBE'S AUTO-RENEWAL NONDISCLOSURES

Adobe argues that Plaintiff Wohlfiel lacks Article III standing to pursue her UCL and FAL claims to the extent they rest on Adobe's auto-renewal disclosures, ¶¶ 150(c)–(d), 178(c)–(d), because

---

[4] "There is no private right of action under the ARL." *Arnold v. Hearst Magazine Media, Inc.*, No. 19-cv-1969-WQH-MDD, 2021 U.S. Dist. LEXIS 25706, at *17 (S.D. Cal. Feb. 10, 2021) ("A consumer who has been harmed by a violation of the ARL may bring a claim pursuant to other consumer protection statutes, including the FAL, CLRA, and UCL.").

she cancelled before any annual renewal. MTD at 19–20. That argument mistakes the timing of a renewal for the timing of the injury. Wohlfiel was injured when she paid for subscriptions—and then early termination fees—that she would not have incurred had Adobe disclosed the plan's terms.

Plaintiffs who "spent money that, absent defendants' actions, they would not have spent" have suffered "a quintessential injury-in-fact," one "created at the moment of fraudulent purchase," and a nondisclosure that induced the purchase supplies "a direct causal link" to that injury. *Maya*, 658 F.3d at 1069–70; *see Hinojos v. Kohl's Corp*., 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (plaintiffs who allege they "paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so" have "suffered an Article III injury in fact" (quoting Mazza v. Am. Honda Motor Co., 666 F.3d 581, 595 (9th Cir. 2012))); *cf. Mayron v. Google LLC*, 54 Cal. App. 5th 566, 574 (2020) (UCL standing for auto-renewal disclosure claim turned on whether plaintiff ordered the service but "would not have done so had the disclosures been provided").

Here, Wohlfiel alleges that she bought roughly ten ABM subscriptions for a short-term photography job believing they were month-to-month; that Adobe's enrollment process did not clearly disclose the year-long commitment or the early termination fee; that she would not have purchased the subscriptions had she known their true terms; and that she learned those terms only when she tried to cancel, then paid an early termination fee on each subscription. ¶¶ 99–110, 168, 189. Those payments are economic injuries traceable to Adobe's nondisclosure at enrollment. Article III does not require that the undisclosed terms also produce a renewal charge before the subscriber they injured may sue.

Adobe cites no written decision requiring a renewal—only a statement from the bench at a hearing in Singh, after which the court granted the motion with leave to amend by minute entry. MTD at 20; *Singh v. Adobe Inc.*, No. 3:24-cv-03980-JSC, ECF No. 34 (N.D. Cal. Feb. 13, 2025). Whatever weight that statement carries, it helps Wohlfiel: the ABM plan "is an annual contract that then automatically renews for another year." MTD at 20. Automatic renewal is thus a term of the plan she bought, and a subscriber injured by Adobe's failure to disclose that term at enrollment need not wait for a renewal to sue.

## IV. PLAINTIFFS PLAUSIBLY ALLEGE ENTITLEMENT TO EQUITABLE RELIEF.

Adobe argues that Plaintiffs fail to allege they lack an adequate legal remedy and therefore cannot pursue claims for equitable relief. MTD at 20-24. At the pleading stage, allegations supporting the conclusion that equitable relief is more certain, prompt, and efficient than damages are sufficient.

"To establish equitable jurisdiction and recover equitable relief, a plaintiff must plead and show a lack of adequate remedies at law." *Crowder v. Shade Store, LLC*, No. 23-cv-02331-NC, 2025 U.S. Dist. LEXIS 43189, at *5 (N.D. Cal. Mar. 10, 2025) (Cousins, M.J.) (citing *Sonner v. Premier Nutrition Corp*., 971 F.3d 834, 844 (9th Cir. 2020); *Guthrie v. Transam. Life Ins. Co*., 561 F. Supp. 3d 869, 875 (N.D. Cal. 2021)). A plaintiff "must provide a plausible basis to conclude that 'the same amount of money for the exact same harm is inadequate or incomplete.'" *Phillips v. Brooklyn Bedding LLC*, No. 23-cv-03781-RFL, 2024 U.S. Dist. LEXIS 72676, at *3 (N.D. Cal. Mar. 28, 2024) (quoting *Sonner*, 971 F.3d at 844).

Plaintiffs acknowledge, as this Court has recognized, that "courts within the Ninth Circuit are divided as to the allegations required to establish inadequate remedies at law for past harm at the pleading stage." *Crowder*, 2025 U.S. Dist. LEXIS 43189, at *7 (comparing cases). Still, decisions of this district have repeatedly found that allegations that equitable relief is more certain, prompt, and efficient than damages are sufficient at the pleading stage to allege that damages are inadequate. *See,* e.g., *id.* at *7–8 ("Here, the Court finds, as other courts have, that Plaintiffs' allegations that damages are inadequate because restitution is more certain, prompt, and efficient are sufficient at the pleading stage.") (collecting cases); *French v. Banana Republic LLC*, No. 24-cv-05216-VC, 2024 U.S. Dist. LEXIS 200279, at *6 (N.D. Cal. Nov. 4, 2024) ("In this case, and at this stage, the plaintiff has plausibly asserted that damages and restitution would not be for the 'same amount of money for the exact same harm.'") (quoting *Sonner*, 971 F.3d at 844). At least one Northern District court noted that "the fundamental thing that *Sonner*, by its own terms, requires at the pleadings stage is that the complaint 'allege that [the plaintiff] lacks an adequate legal remedy'" and that "because *Sonner* was decided at a later posture…if a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will

rarely (if ever) require more this early in the case." *Johnson v. Trumpet Behavioral Health, LLC*, No. 3:21-cv-03221-WHO, 2022 U.S. Dist. LEXIS 3706, at *8-9 (N.D. Cal. Jan. 7, 2022) (alteration in original) (citations omitted).

Plaintiffs explicitly allege that they lack an adequate legal remedy, for various reasons that plausibly demonstrate that equitable relief is more certain, prompt, and efficient than damages. ¶¶ 170 (UCL – comparing differences in claims and relief available); 191 (FAL – same); 213 (CLRA – same). Together, these allegations are sufficient at the pleading stage. Adobe argues that Plaintiffs' allegations remain deficient because they do not demonstrate how the money sought through the equitable claims is different than the money sought as damages and why monetary damages would be inadequate to make them whole. MTD at 21. However, Plaintiffs do just that. *See* ¶¶ 170 (UCL – restitution reaches additional practices that may be threshold issues for recovery, is measured differently, and is more promptly and certainly determined from Adobe's records); 191 (FAL – similar); 213 (CLRA – similar); 220 (Restitution – similar).

## V. PLAINTIFFS DO NOT RAISE STAND-ALONE "SIMPLE CANCELLATION" CLAIMS.

Adobe contends that neither Plaintiff alleges an injury traceable to procedural obstacles in the cancellation process, and therefore Plaintiffs do not have Article III standing to pursue individual or class claims premised on a failure to provide a simple cancellation mechanism. MTD at 24–25. This argument should be denied as irrelevant as the SAC contains no such claims.

Plaintiffs do not raise any stand-alone "simple cancellation mechanism" claims. None of Plaintiffs' claims turn on or depend on the complexity or accessibility of the mechanisms of Adobe's cancellation process. The claims touch on the cancellation process only in regard to the imposition and calculation of the ETF. The SAC's factual allegations about Adobe's cancellation process mechanisms, such as ¶¶ 78-83, provide important contextual and background information on cancellation rates and are relevant to the classes and subclasses and to damages, but they are not distinct claims.

As there are no individual or class claims based on an alleged failure to provide a simple

cancellation mechanism, Adobe's derivative argument that the ABM Class and ABM Cancellation Attempt Subclass (and the corresponding portions of the Consumer Subclass) should be dismissed in their entirety for Plaintiffs' purported lack of class standing for such claims is immaterial and should also be denied. MTD at 25.

## VI. THERE IS NO BASIS TO STRIKE CLASS AND SUBCLASS ALLEGATIONS.

Adobe urges the Court to dismiss the ABM Class and ABM Cancellation Attempt Subclass, and corresponding members of the Consumer Subclass, as well as the nationwide class allegations. MTD at 25-28.[5] These arguments are waived at this stage[6] under Rule 12(g)(2) (Adobe did not raise them in its previous Rule 12 motion to dismiss even though they were equally available to it at the time, *see* ECF No. 7), but they are also meritless and premature.

Adobe contends that the ABM Class and ABM Cancellation Attempt Subclass encompass three potential groups: (1) consumers who never attempted to cancel their ABM subscription; (2) consumers who attempted to cancel their ABM subscription but did not complete the process because of its alleged complexity; and (3) consumers who attempted to cancel their ABM subscriptions but did not complete the process to avoid the ETF. MTD at 25. Relying on its groupings, Adobe contends that neither Plaintiff can represent the putative class members in the first and second groups. MTD at 25. Adobe adds that the Court should strike the classes because putative class members in the third group have not suffered an injury. MTD at 25. Adobe also argues that the Court should strike the nationwide class allegations because California law would not apply to out-of-state residents. MTD at 26-28.

### A. Adobe Misconstrues Plaintiffs' Claims. Rule 23, not Article III standing, Applies to

---

[5] Although labeled as a 12(b)(1) and/or 12(b)(6) argument, Adobe's class arguments are substantively a request to strike class allegations under Rule 12(f). *See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000). Adobe's arguments on these issues do not challenge the Court's subject-matter jurisdiction or the legal sufficiency of any claims.

[6] Rule 12(g)(2) applies to motions under Rules 12(b)(6) and 12(f), and provides that "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Accordingly, a defendant who fails to assert an argument under Rule 12(f) waives that argument in subsequent Rule 12 motions.[6]

**Purported Dissimilarities Between Class Representatives and Unnamed Class Members.**

Adobe argues that no named plaintiff can assert claims on behalf of putative class members who never attempted to cancel their ABM subscription and those who attempted to cancel but did not because of its alleged complexity because neither Plaintiff alleges having such an experience. MTD at 25. This argument misstates the claims in this matter and conflates standing and class certification.

Adobe's argument is based on misrepresentations of Plaintiffs' claims in this matter. As explained in Section V, Plaintiffs do not seek to pursue "simple cancellation" claims or represent a class under such claims. Adobe also confuses the criteria that define class membership with what class claims are asserted. That the ABM Cancellation Attempt Subclass is defined by reference to a cancellation attempt does not turn its members' claims into "cancellation" claims. A class definition does not set out the theory of liability. The members within each class assert the same claims, based on Adobe's same alleged misconduct. Adobe treats its invented "groups" as if they were separate claims and then attacks claims Plaintiffs never brought.[7]

Adobe's argument also conflates standing and class certification. "*Standing* is meant to ensure that the injury a plaintiff suffers defines the scope of the controversy he or she is entitled to litigate. *Class certification*, on the other hand, is meant to ensure that named plaintiffs are adequate representatives of the unnamed class." *Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015) (emphasis in original) (citation omitted). In *Melendres*, the Ninth Circuit adopted the "class certification approach" to address alleged differences between claims of named plaintiffs and absent class members. 784 F.3d at 1262. Under that approach, "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded" and "any issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing." *Id.* (internal quotation marks and citation omitted). Here, Plaintiffs have individual standing to pursue their claims for the

---

[7] Adobe also does not explain why this point (even if it were not baseless) would require the ABM class, which is not defined by a cancellation attempt, to be dismissed in its entirety.

reasons herein and based on the allegations in the SAC.

Thus, to the extent there are any differences between the Plaintiffs and certain class members as alleged, that is a question of class certification and requires assessment of Rule 23's typicality and adequacy of representation requirements. *See Melendres*, 784 F.3d at 1262 (internal quotation marks omitted) ("[r]epresentative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation"). Adobe provides no argument addressing either typicality or adequacy of representation under Rule 23.

In any case, such challenges are for the class certification stage. *See Hill*, 2025 U.S. Dist. LEXIS 84530, at *16 ("[C]ourts in this District do not generally consider motions to strike class allegations at the pleading stage."); *see also Nunez v. Saks Inc.*, 771 F. App'x 401, 402 (9th Cir. 2019) (applying the class certification approach at the pleading stage, finding that because the plaintiff "demonstrated standing to pursue his individual claims, the district court should have deferred consideration of whether he was an adequate class representative until the class certification stage of proceedings.") (citing *Melendres*, 784 F.3d at 1261-62). In line with this District's traditional approach, the Court should defer any assessment of whether Plaintiffs' experiences were sufficiently similar to those of the putative class members to the class certification stage.

**B. Plaintiff Marquez and Putative Class Members Who Did Not Cancel Were Injured by Adobe's Misconduct.**

Adobe argues that Plaintiff Marquez and other putative class members who did not cancel to avoid the ETF were not injured,[8] and therefore the ABM Class and ABM Cancellation Attempt Subclass must be stricken. MTD at 25. This argument conflates injury with damages, and it ignores the SAC's allegations.

---

[8] Adobe seemingly buries a standing argument that Plaintiff Marquez has not suffered a cognizable injury within its request to strike class definitions. This argument is not raised as a basis for dismissal anywhere else in the Motion.

The ABM Class and ABM Cancellation Attempt Subclass definitions are not overbroad. Adobe's contention that Plaintiff Marquez and similarly situated putative class members have not suffered an injury by not cancelling (i.e., not paying the ETF) misstates the nature of the alleged injury. Adobe's argument assumes the only available injury is payment of the ETF. However, Plaintiffs allege that they were injured by Adobe's deception as they would not have purchased the plans (or would have cancelled earlier) absent its misrepresentations about the terms of the ABM plan, including the annual commitment, the existence of the ETF, and how the ETF is calculated. ¶¶ 168, 189, 209, 218, 226. Allegations that a consumer relied on a misrepresentation and would not have bought the product but for it are sufficient to plead economic injury. *See Hinojos*, 718 F.3d at 1104 (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330 (2011)). Class members, including Plaintiff Marquez, did not (and could not) avoid injury simply by not paying the ETF as they were injured at the time of purchase. Adobe also conflates damages with injury—two distinct concepts. The exact costs a putative class member incurred as a result of Adobe's misconduct (for example, payment of the ETF or number of monthly subscription payments made)[9] may be relevant to an assessment of damages and restitution, but is not relevant to pleading injury.

Adobe's argument further fails as dependent on its argument that the annual term was not misleading, which is meritless for the reasons in Section I.B herein. Regardless, this exact type of "benefit of the bargain" argument was specifically rejected in *Kwikset* and is further contradicted by the SAC's allegations. "*Kwikset* held that the 'benefit of the bargain' defense is permissible only if the misrepresentation that the consumer alleges was not 'material.'" *Hinojos*, 718 F.3d at 1107 (citation omitted). Plaintiffs specifically allege that they did not know the plan was an annual commitment due to Adobe's misconduct and that the misrepresentations about the commitment length were material. ¶¶ 104-116, 159-60, 166.

Even if the class definitions were overbroad as alleged, it would be premature to strike such definitions at the pleading stage. Courts in this District consistently decline to address challenges to

[9] This is not an admission or representation as to any limitation on the assessment of damages. These are illustrative examples only.

a putative class's ability to satisfy Rule 23 at the pleading stage, concluding that plaintiffs should be given an opportunity for discovery and to develop class certification arguments. *See, e.g., Rice-Sherman v. Big Heart Pet Brands, Inc.,* No. 19-cv-03613-WHO, 2020 U.S. Dist. LEXIS 46197, at *44 (N.D. Cal. Mar. 16, 2020) ("Even if the class definition is overbroad as alleged, it is premature to strike it at this stage as plaintiffs 'should at least be given the opportunity to make the case for certification based on appropriate discovery.'") (citation omitted); *T.K. v. Adobe Sys. Inc.*, No. 17-CV-04595-LHK, 2018 U.S. Dist. LEXIS 65557, at *39 (N.D. Cal. Apr. 17, 2018) ("although Adobe appears to raise some potentially serious issues with respect to the breadth of T.K.'s proposed class, the Court finds it more appropriate to address these issues at the class certification stage once both sides have had the opportunity to further develop their arguments and engage in discovery."); *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 961 (N.D. Cal. 2018) ("Although these [overbreadth and varying choice of law] concerns are not without merit, [the defendants'] arguments are more appropriately addressed at a later stage of the proceedings when the issues have been more fully developed and sharpened."); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1221 (N.D. Cal. 2014) (declining to strike class allegations based on argument that individual issues will predominate).

### C. This District Consistently Addresses Choice-of-Law at Class Certification and Adobe's Deficient Choice-of-Law Argument Does Not Warrant Changing that Approach.

Adobe argues that under *Mazza,* 666 F.3d at 594, California law cannot apply to the putative nationwide class; instead, the Court must apply the laws of the jurisdiction in which each transaction took place. MTD at 26-28. Adobe's deficient choice-of-law recitation does not support striking the nationwide class claims at this stage.

California courts apply the governmental interest test to determine which state's law applies, which requires a three-step analysis: (1) whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different; (2) if there is a difference, each jurisdiction's interest in the application of its own law under the circumstances of the

particular case to determine whether a true conflict exists; and (3) if there is a true conflict, comparison of the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired. *Mazza*, 666 F.3d at 590 (citation omitted). Under California law, "the place of the wrong has the predominant interest" and California considers the place of the wrong to be "the state where the last event necessary to make the actor liable occurred." *Mazza,* 666 F.3d at 593 (internal quotation marks and citations omitted).

As this Court has recognized in declining to strike class allegations on similar grounds, "[t]hese arguments… are more appropriate at the class certification stage." *Prescott v. Bayer HealthCare LLC*, No. 20-cv-00102-NC, 2020 U.S. Dist. LEXIS 136651, at *26 (N.D. Cal. July 31, 2020) (Cousins, M.J.) (deferring decision on Defendants' motion to strike until class certification). In another case against Adobe, Judge Koh succinctly stated that "[t]his Court has consistently declined to apply *Mazza* at the motion to dismiss stage to strike nationwide class allegations." *T.K. v. Adobe Sys. Inc.*, No. 17-CV-04595-LHK, 2018 U.S. Dist. LEXIS 65557, at *38 (N.D. Cal. Apr. 17, 2018) (collecting cases). In *T.K.*, the court rejected a similar argument by Adobe that the court should strike class allegations at the pleading stage because each state would apply its own law. In reaching its conclusion, the court found that "aside from Adobe's discussion of *Mazza*, Adobe only offers one paragraph and one footnote of analysis on the choice of law issue" and that "a more detailed choice-of-law analysis [was] required to rule on th[e] issue." *Id.* at *39.

Similarly here, Adobe offers only a conclusory and abbreviated discussion of the choice-of-law issue, without a detailed analysis specific to the facts of this case and its six causes of action. As to the first and second step of the inquiry, Adobe makes no attempt to compare or even identify the different state laws applicable to this matter or to identify which states' interests are even at issue. Instead, Adobe relies principally on *Mazza* and a blanket assertion that both steps have been established as a matter of law. MTD at 26–27. However, none of the cases cited by Adobe stand for the proposition that either of those steps have been established as a matter of law for each of the claims in this case. Even if there are differences in the states' laws, the present record does not demonstrate that such differences are material to this specific matter. The choice-of-law analysis is a

fact-specific inquiry that depends on the specific facts of this matter. *See Mazza,* 666 F.3d at 594 (issuing the holding "[u]nder the facts and circumstances of this case…").

As to the third step, Adobe makes no attempt to evaluate or compare the nature and strength of the states' interests under the third step of the inquiry. Indeed, as noted above, it is not even clear which states' interests are at issue in order to conduct such an analysis. Further, the "place of the wrong" can differ based on the specific cause of action. *See, e.g., Mazza*, 666 F.3d at 593 (noting that the geographic location of an omission is the place of the transaction where it should have been disclosed) (citing *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 94 n.12 (2010)); *Zinn v. Ex-Cell-O Corp.,* 148 Cal. App. 2d 56, 80 n.6 (1957) (concluding in fraud case that the place of the wrong was the state where the misrepresentations were communicated to the plaintiffs). Adobe makes no attempt to identify the purported "place of the wrong" or place where the last event necessary to make it liable occurred in any cause of action. MTD at 27. Instead, Adobe merely recites quotes from *Mazza* regarding the "place of wrong" standard without any analysis or conclusion. The Court cannot evaluate these steps without sufficient information. *See Dalton v. Anovos Prods., LLC*, No. CV 19-4821-MWF-KS, 2019 U.S. Dist. LEXIS 228855, at *23-24 (C.D. Cal. Sept. 27, 2019) ("on this record it is not clear the interest each state has in applying its own laws; indeed, it is not entirely clear which states' interests are even *at issue*. For similar reasons, the Court is unable to evaluate or compare the nature and strength of the interest of each jurisdiction under the third step of *Mazza*.") (emphasis in original).

Adobe cites six cases in which courts did not defer the choice of law analysis until class certification—five of them from the Central District of California. Although some courts decline to defer the choice of law decision, they do so typically only in the limited circumstance where the court determines that discovery on the issue will not change the outcome. *See, e.g.*, *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1007-09 (N.D. Cal. 2014). That is not the case here. Discovery will permit the Plaintiffs to determine the scope of the nationwide class and the state laws at issue. Plaintiffs cannot determine the scope of the nationwide class, including the distribution among the states, the state laws at issue, and the factual/legal differences between the laws, without discovery. Discovery will also

likely reveal more contacts between consumers and California, as well as the nature and scope of Adobe's alleged deceptive practices, and may impact the materiality of any differences between California and other states' laws. Depending on the number of affected jurisdictions and the details of Adobe's practices, it is possible to certify a nationwide class. Discovery will allow the Court to consider a developed factual record and receive comprehensive briefing on choice-of-law or class certification from the parties.

## VII. IF THE COURT GRANTS THE MOTION IN ANY RESPECT, IT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND.

If the Court grants Adobe's Motion in any respect, the Court should grant Plaintiffs leave to amend. *See* Fed. R. Civ. P. 15. Rule 15(a) provides that a district court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[D]ismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003). Particularly with respect to Adobe's new (waived) arguments, any possible deficiencies can be cured through additional factual allegations.

## CONCLUSION

For the foregoing reasons, the Court should deny Adobe's Motion.

Date: October 27, 2026

**COULSON P.C.**

/s/ *Nicholas A. Coulson*
Nicholas A. Coulson, Esq. (SBN 358903)
nick@coulsonpc.com
Ellyn Gendler (SBN 305604)
Egendler@coulsonpc.com
300 River Place Drive
Suite 1700
Detroit, Michigan 48207
T: (313) 644-2685

*Counsel for Plaintiffs and the Proposed Class*